# Supreme Court of Kentucky

## 2005-SC-000879-DG

**FLOYD MIKE JONES III**        APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
CASE NUMBER 2003-CA-002422
MEADE CIRCUIT COURT NO. 01-CR-00117

**COMMONWEALTH OF KENTUCKY**        APPELLEE

## OPINION OF THE COURT BY JUSTICE MINTON

## AFFIRMING IN PART AND

## REVERSING AND REMANDING IN PART

### I. INTRODUCTION.

Floyd Mike Jones III was convicted of one count of incest, thirteen counts of sodomy in the third degree, eight counts of rape in the third degree, and one count of bribing a witness. The victim of Jones's alleged sexual misconduct was his teenage stepdaughter, M.G. The Court of Appeals affirmed Jones's conviction.

We granted discretionary review to consider the propriety of the trial court's decisions to (1) limit the testimony of Jones's DNA expert; and (2) permit the Commonwealth to introduce pornographic images into evidence, despite the lack of a nexus between those images and the testimony of M.G. We reverse and remand on the first issue and provide direction on remand as to the second issue.

## II. FACTUAL AND PROCEDURAL HISTORY.

The grand jury indicted Jones on one count of incest, thirteen counts of sodomy in the first degree, eight counts of rape in the third degree, one count of using a minor in a sexual performance, one count of possession of matter portraying a sexual performance by a minor, and one count of bribing a witness. At trial, numerous heated disputes arose between Jones's counsel and the Commonwealth. Chief among those disputes was Jones's counsel's attempt to present the testimony of a DNA expert, Dr. Yuri Melekovets, and Jones's repeated, vehement objection to the Commonwealth's showing the jury pornographic images allegedly copied from Jones's home computers.

### A. Dr. Melekovets's Testimony.

Jones had furnished a copy of Dr. Melekovets's one-page report to the Commonwealth as pretrial discovery several months before trial. The Commonwealth reciprocated with a copy of the two-page report of its DNA expert, Benedict Arrey. Arrey's report stated that "[t]he human DNA recovered from the male fraction of the [v]aginal swab [taken from M.G.] . . . was a mixture of at least two contributors. [M.G.] and Floyd Jones III . . . could be contributors to the DNA mixture. . . . The expected frequency of possible contributors to the mixed profile in the male fraction is fewer than 1 in 15,000,000 (1 in 15 million) among Caucasian, Black[,] and Hispanic Americans." In contrast, Dr. Melekovets's report stated that he "did not find any traces of the Y-chromosome or of the DNA profile from Exhibit 2A (bloodstain standard from Floyd Jones III) on the vaginal swabs from [M.G.]."

The trial court allowed Dr. Melekovets to testify about the contents of his report. But the trial court did not allow Dr. Melekovets to testify about any perceived

2

shortcomings in the Commonwealth's DNA expert's report or methodology because Jones had not informed the Commonwealth during discovery that he intended for Dr. Melekovets to criticize the Commonwealth's expert's methodologies. In other words, the trial court essentially confined Dr. Melekovets's testimony to the four corners of his report.

### B. Introduction of the Pornographic Images Taken from Jones's Computers.

M.G. testified that Jones frequently showed her pornographic images of young women engaged in sexual activity before his sexual encounters with her. But M.G. did not testify that the pornographic images introduced by the Commonwealth, which were copied from computers in Jones's home, were the actual images shown her by Jones. Rather, these pornographic images were shown to the jury and introduced into evidence via the testimony of a state police computer forensics expert who had copied the hard drives from Jones's home computers onto a compact disc. The Commonwealth brought a computer into the courtroom and used it to show numerous pornographic images to the jury. Though the trial videotape did not definitively tell us which images the jury saw, Commonwealth's Exhibit #8 (the compact disc containing dozens of pornographic images ostensibly taken from Jones's home computers' hard drives) has numerous hardcore images of nude females, some of whom appear to be multiple-amputees, engaged in various sexually explicit activities, including urination and bestiality.

Although Jones's counsel lodged vehement objections to the admissibility of the images in question, Jones's counsel did not specifically object to the lack of an

3

evidentiary nexus between the images allegedly shown by Jones to M.G. and the images shown by the Commonwealth to the jury.[1]

After several days of testimony, the jury convicted Jones of one count of incest, thirteen counts of sodomy in the third degree, eight counts of rape in the third degree, and bribing a witness. The jury found Jones not guilty of possession of matter portraying a sexual performance by a minor, and the trial court granted the Commonwealth's motion to dismiss the charge of using a minor in a sexual performance.

In accordance with the jury's recommendation, the trial court sentenced Jones to ten years for the incest offense, one year on each of the thirteen convictions for third-degree sodomy, three years for each of the eight convictions for third-degree rape, and five years for the conviction for bribing a witness. The sodomy, rape, and bribing a witness sentences were ordered to run concurrently with the incest sentence, for a total sentence of ten years' imprisonment.

Jones appealed to the Court of Appeals, claiming two errors: (1) the trial court erred by limiting Dr. Melekovets's testimony to the four corners of his report, and (2) the trial court erred by permitting the Commonwealth to introduce allegedly irrelevant and prejudicial pornographic images into evidence when M.G. had not testified that the images shown to her by Jones were the same images shown to the jury.

The Court of Appeals affirmed Jones's conviction, finding that the limitation of Dr. Melekovets's testimony was proper because Jones's failure to disclose during discovery Dr. Melekovets's theories regarding alleged errors made by the

---

[1]  Curiously, Jones's counsel did successfully raise this lack of a nexus argument regarding an apparently sexually-oriented book found in Jones's home.

4

Commonwealth's DNA expert ran afoul of the reciprocal discovery requirements set forth in Kentucky Rule of Criminal Procedure (RCr) 7.24. The Court of Appeals also held that Jones had not preserved his claim regarding the lack of a nexus between the pornographic images shown to the jury and M.G.'s testimony; and, in any event, any error in introducing the pornographic images was harmless in light of the totality of the evidence arrayed against Jones.

We granted discretionary review to consider the same two issues Jones raised before the Court of Appeals. We hold that the trial court erred in limiting Dr. Melekovets's testimony to the four corners of his report. Thus, since this case is being remanded for further proceedings, the issue involving the pornographic images is technically moot. But since the Commonwealth will likely again attempt to introduce these pornographic images on remand, we must address that issue.

## III. ANALYSIS.

### A. Restricting Dr. Melekovets's Testimony Was Erroneous.

The trial court refused to permit Dr. Melekovets to testify as to anything outside the parameters of his report, apparently because the trial court believed that RCr 7.24(3)(A)(i) required the parties to provide in discovery the theories underlying their experts' opinions. We disagree.

The trial court's order of reciprocal discovery[2] essentially tracked the requirements of RCr 7.24(3)(A)(i), which requires a defendant to "permit the

---

[2] The discovery order issued by the trial court required Jones to provide "a list of, and an opportunity to inspect, copy or photograph, all statements, scientific or medical reports, books, papers, documents or tangible objects which the Defendant intends

5

Commonwealth to inspect, copy, or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case . . . ." We recently expressly rejected the notion that RCr 7.24 encompasses anything not explicitly covered by the rule by holding that RCr 7.24(3)(A)(i) "applies **only** to results or reports of scientific tests or experiments."[3] Of course, we do not countenance any attempt to skirt what we hold to be the limited parameters of RCr 7.24; and the courts of the Commonwealth must not allow either the Commonwealth or defense counsel to play a "cat and mouse game"[4] with the rules governing discovery.[5]

---

to produce at the trial and are in his possession, custody or control, within fifteen (15) days after receiving discovery."

[3] Gray v. Commonwealth, 203 S.W.3d 679, 686 (Ky. 2006) (emphasis added).

[4] James v. Commonwealth, 482 S.W.2d 92, 94 (Ky. 1972).

[5] See, e.g., George v. Commonwealth, No. 2001-SC-001067-MR, 03 WL 22227195 at *7 (Ky. September 18, 2003). In George, the Commonwealth spoke with a forensic pathologist before trial in an effort to learn more about the nature and extent of the injuries to a victim in a case involving charges of rape and assault. The pathologist did not issue a written report, and no notice was given to defense counsel that the pathologist had given an oral report or would be a witness for the Commonwealth. At trial, defense counsel objected to the pathologist's testimony due to the lack of pretrial discovery. The trial court overruled the objection. On appeal, we acknowledged that the Commonwealth was not required under the explicit provisions of RCr 7.24 to disclose the basis of the pathologist's testimony because the pathologist had not issued a written report. However, we further held that permitting the expert to testify was reversible error because the Commonwealth had violated the "spirit" of RCr 7.24 by having only an undisclosed oral conversation with the expert prior to offering the expert's testimony. Id. at *6. Such a seemingly deliberate attempt to surprise opposing counsel "produce[d] in acute form the very evils that discovery has been created to prevent." Id. Since Jones provided Dr. Melekovets's report to the Commonwealth in discovery, there obviously was no deliberate attempt to skirt the requirements of RCr 7.24.

So the conclusion of the Court of Appeals that the trial court properly limited Dr. Melekovets's testimony (because Jones committed a discovery violation when he did not provide the Commonwealth with the entire underlying bases for Dr. Melekovets's testimony) is premised upon an impermissibly broad interpretation of RCr 7.24. Therefore, since Jones provided the Commonwealth all that was required in discovery concerning Dr. Melekovets's report, the trial court erred when it relied upon RCr 7.24 to limit Dr. Melekovets's testimony.

Moreover, we reject the Commonwealth's argument that the trial court merely exercised its discretion to sanction a discovery violation when it limited Dr. Melekovets's testimony. We certainly do not approve of any party engaging in improper dilatory tactics during the discovery process. And we agree with the Commonwealth's unassailable contention that a trial court generally has broad discretion under RCr 7.24(9) to impose an appropriate sanction for a discovery violation. But we do not agree with the Commonwealth that the trial court's limitation of Dr. Melekovets's testimony was merely an example of a trial court exercising its discretion to sanction a discovery violation. Simply put, no party may be sanctioned for committing a nonexistent discovery violation.

Having determined that nothing in the language of RCr 7.24 itself supports the trial court's decision to bar Dr. Melekovets's contested testimony, we also reject the Commonwealth's contention that our prior precedent compels us to find that the limitations imposed by the trial court were proper. Specifically, we hold that <u>Barnett v.</u>

Commonwealth,[6] which the Court of Appeals relied upon, does not support the trial court's decision to limit Dr. Melekovets's testimony.

Barnett was a case involving a murder for which there were no eyewitnesses. The Commonwealth contended that Barnett killed his wife late at night on an isolated road. In an effort to prove Barnett's guilt, the Commonwealth offered the testimony of an expert serologist who testified that traces of blood found on Barnett were consistent with Barnett having washed blood off his hands in a nearby puddle after stabbing his wife. The serologist's report did not contain his opinion regarding Barnett's purported hand washing. On appeal, we held that it was error for the trial court to permit the serologist to testify at trial about the hand washing because the serologist's report did not contain any opinions regarding hand washing.[7]

---

[6]  763 S.W.2d 119 (Ky. 1988).

[7]  *Id.* at 123 ("Next, we consider the testimony of the Commonwealth's serologist who testified that there were faint traces of blood that could be found on the appellant's hands and arms, and then opined that this was attributable to washing away the blood that could have been expected from the victim's wounds. Appellant first contends that this was an impermissible speculation, rather than an opinion, there being no evidence from which it could be inferred that the appellant engaged in washing to support a hypothetical question, as required by Hodge v. Commonwealth, 289 Ky. 548, 159 S.W.2d 422 (1942). The presence of a nearby puddle would support an inference, albeit weak, that there was at least an opportunity for the appellant to wash the blood off of his hands. This evidence was weak because the undisturbed condition of the puddle and of the appellant and of his clothing refuted the implication that washing had occurred. All things considered, we conclude that the serologist's conclusion was admissible as opinion evidence, but the appellant was entitled under RCr 7.24 to be confronted with the fact that this opinion would be presented against him before the trial started so that he had a reasonable opportunity to defend against the premise. RCr 7.24(1)(b) requires that on motion the Commonwealth must produce 'results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case.' The appellant moved for this discovery and was provided a report which did not include this significant piece of information, the expert's opinion as to what the physical findings indicated. James v. Commonwealth, *supra,* suggests that

The Court of Appeals held in the instant case that the discovery violation in Barnett is similar to the one in the case now before us. We disagree.

In Barnett, defense counsel had no way to anticipate that the serologist would opine at trial that Barnett may have washed his hands in a nearby puddle after stabbing his wife because nothing in the serologist's report hinted at such a conclusion. Thus, as we have previously attempted to explain, Barnett stands for the principle that an expert may not testify to an additional, undisclosed principle or premise not readily deducible from the conclusions contained in that expert's report.[8] In other words, Barnett was based upon our desire to prevent a party from being deliberately surprised at trial. The situation in the case at hand is different.

Dr. Melekovets's report indicated that he found no Y-chromosomes on the vaginal swab taken from M.G. Implicitly underlying that conclusion is the obvious fact that Dr. Melekovets fundamentally disagreed with the Commonwealth's DNA expert's conclusion that the male DNA found in the vaginal swab taken from M.G. matched Jones. After all, a lack of Y-chromosomes necessarily rules out a match for Jones's—or

---

this was error, and given the equivocal background circumstances, here it was reversible error.").

[8] See Milburn v. Commonwealth, 788 S.W.2d 253, 256 (Ky. 1989) ("we found in Barnett that the report provided by the Commonwealth to Barnett omitted a significant piece of information. . . . Unlike the instant case, however, the expert's conclusion in Barnett was based not only on the premise contained in the report, but also on an additional and necessary premise. To reach the conclusion that Barnett may have washed away the victim's blood, the serologist relied on the light blood traces he found on Barnett's hands and arms. But in order to be relevant and admissible, the expert's opinion also had to be based on evidence that Barnett had an opportunity to wash his hands. Yet without prior knowledge of the expert's opinion, Barnett had no reason to develop proof that the puddle near the murder scene was undisturbed or that Barnett's person or clothing was not damp or splashed from washing, so as to refute the expert's opinion.").

any other male's—DNA on the vaginal swab. In other words, it surely could not have come as a surprise to the Commonwealth that Dr. Melekovets would disagree with the conclusion and/or analytical process used by the Commonwealth's DNA expert in light of the conclusions contained in Dr. Melekovets's report. So we fail to perceive how permitting Dr. Melekovets to explain why he found fault with the Commonwealth's DNA expert's conclusion and/or methodology would have been impermissible "sandbagging."[9]

However, we must note that we reject Jones's contention that the Commonwealth's burden in a reciprocal discovery case is somehow greater than that borne by the defendant. We perceive nothing in the language of RCr 7.24 or Barnett, or its progeny, to support Jones's seeming contention that a defendant is entitled to the benefits of reciprocal discovery while simultaneously avoiding its concomitant burdens.

---

[9] The fact that the Commonwealth had released its DNA expert to return to Virginia long before Dr. Melekovets was called as a witness does not alter this analysis. The Commonwealth has not indicated that it could not have requested that its expert remain in the vicinity of the trial, subject to recall. Had the Commonwealth, forewarned from his report that Dr. Melekovets disagreed with its expert's conclusions, taken measures to ensure that its expert had remained subject to recall, the possibility of any sandbagging would have been entirely eliminated.

Likewise, we do not agree that Jones's counsel figuratively bound Dr. Melekovets's hands by agreeing during one of the numerous bench conferences that semen was found in M.G.'s vagina. And Jones's counsel did appear to make such an acknowledgement at one point. But after viewing the entire bench conference, we accept Jones's counsel's contention that despite his imprecise language, he was only acknowledging that the Commonwealth's DNA expert concluded that there was semen in M.G.'s vagina. In other words, regardless of the imprecise language Jones's counsel may have used, nothing said at that bench conference was sufficient to bar Dr. Melekovets from testifying as to why he disagreed with the Commonwealth's DNA expert's conclusions; and we reject the Commonwealth's contention that Jones's counsel was somehow attempting to conceal Jones's defense. That contention is belied by the fact that Jones provided Dr. Melekovets's report during discovery.

10

And we frown equally upon any discovery violations, including sandbagging, by **any** party.

Having determined that it was error for the trial court to limit Dr. Melekovets's testimony due to a nonexistent discovery violation, we now must address the Commonwealth's contention that any error in this regard was harmless.

Under RCr 9.24, "[n]o error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." Indeed, since an accused has a constitutional right to present witnesses and evidence in his own defense,[10] we must determine whether the error in limiting Dr. Melekovets's testimony was harmless beyond a reasonable doubt.[11]

The Commonwealth's DNA expert's report opines that Jones and M.G. were "contributors to the DNA mixture" contained on the vaginal swab taken from M.G. Furthermore, that report states that "[t]he expected frequency of possible contributors to the mixed profile in the male fraction is fewer than 1 in 15,000,000 (1 in 15 million)

---

[10] *See, e.g.,* Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."); Taylor v. Illinois, 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) ("The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words[.]").

[11] *See, e.g.,* Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

11

among Caucasian, Black[,] and Hispanic Americans." So it was crucial for Jones to present testimony to counteract, or at least cast doubt upon, the Commonwealth's DNA expert's report. But Jones was unable to attempt fully to cast doubt upon the potentially devastating effect of the Commonwealth's DNA expert's conclusions and report because of the trial court's limitation on Dr. Melekovets's testimony. Because Jones's right to present a defense to the charges against him was substantially curtailed by the trial court's limitation upon Dr. Melekovets's testimony, we cannot find that error to be harmless beyond a reasonable doubt.

For the foregoing reasons, we hold that Jones's convictions for incest, rape, and sodomy must be reversed. But Jones's conviction for bribing a witness is affirmed because the improper limitation on Dr. Melekovets's testimony had no discernible bearing upon that conviction.

B. On Remand, the Pornographic Images May Not Be Introduced and Shown to the Jury Unless a Nexus is Shown Between the Images and M.G.'s Testimony.

Because Jones's convictions for incest, rape, and sodomy are being reversed due to the trial court's improper limitation on Dr. Melekovets's testimony, the issue regarding the pornographic images shown to the jury is technically moot. But because the Commonwealth will likely want to present that evidence at any retrial, we must address the issue.[12]

M.G. did not testify that the images in question which were shown to the jury were the same images shown to her by Jones. We have previously condemned the

---

[12] We note that this issue is questionably preserved. However, since the case is being reversed on other grounds, we need not definitively state whether the issue was, or was not, properly preserved for appellate review.

similar introduction of such unrelated, sexually-oriented testimony in <u>Dyer v. Commonwealth</u>.[13]

In <u>Dyer</u>, the defendant was charged with sodomizing a boy less than twelve years of age. The victim testified that the defendant had shown him pictures depicting nudity, but the victim did not specifically identify any of the pictures depicting nudity introduced by the Commonwealth as having been shown him by the defendant. On appeal, we held that:

> It is obvious the real purpose, the sole purpose, of this evidence was, in general, to prove the appellant was a sexual pervert, and, in particular, to prove that his perversion was pedophilia, and to do so on the basis of reading material found in his possession some of which would offend a substantial number of jurors, prejudicing them against the appellant without regard to whether it proved anything against him. The various pornographic pictures and articles and the nondescript photographs and memorabilia were devoid of meaning except that provided by the investigating police officer's testimony and the prosecutor's argument labeling the material seized proof that the appellant was a pedophile.
>
> **We declare, unqualifiedly, that citizens and residents of Kentucky are not subject to criminal conviction based upon the contents of their bookcase unless and until there is evidence linking it to the crime charged.** If the boy's testimony was intended to be the connecting link, evidence would be limited to that which the boy could identify as having been shown to him.[14]

Despite the clear warning of <u>Dyer</u>, the Commonwealth made no effort in the case at hand to link these sexually explicit images to any sexual contact Jones allegedly had

---

[13] 816 S.W.2d 647 (Ky. 1991), *overruled on other grounds by* <u>Baker v. Commonwealth</u>, 973 S.W.2d 54 (Ky. 1998).

[14] *Id.* at 652 (emphasis added).

with M.G. So the introduction of the contents of Jones's electronic bookcase—the contents of his home computers—was highly improper. Thus, on remand, the Commonwealth should only be allowed to introduce evidence that has a demonstratively direct bearing upon the charges against Jones.[15]

Finally, we note that the trial court specifically stated that it purposely never viewed the sexually explicit images before they were exhibited to the jury. In its role as a gatekeeper of evidence, a trial court must view and consider any disputed evidence to determine its admissibility on relevancy grounds, regardless of the revolting nature of that evidence. Stated another way: how could the trial court properly weigh the prejudicial effect of these images against their putative, probative value without first seeing them? On remand, the trial court must not abdicate its gatekeeping role by ruling in a vacuum as to the admissibility of unseen images or objects.

## IV. CONCLUSION.

For the foregoing reasons, Floyd Mike Jones III's convictions for incest, rape in the third degree, and sodomy in the third degree are reversed and remanded for proceedings consistent with this opinion. Jones's conviction for bribing a witness is affirmed. Jones has not asked us to remand this matter to the trial court for resentencing on the bribing a witness conviction, and we decline to do so on our own motion.

---

[15] The Commonwealth's contention that the images were relevant to prove Jones's guilt of the crime of possession of matter portraying a sexual performance is belied by the jury's not guilty verdict on that charge. Regardless, Jones's acquittal on that charge means that the Commonwealth may not rely upon that rationale to introduce the images on remand.

14

All sitting. Abramson, Cunningham, Noble, Schroder, and Scott, JJ., concur.

Lambert, C.J., concurs in part and dissents in part by separate opinion.


COUNSEL FOR APPELLANT:

Alec G. Stone
Stone Law Office
469 East Broadway
P. O. Box 487
Brandenburg, KY 40108-0487


COUNSEL FOR APPELLEE:

Gregory D. Stumbo
Attorney General of Kentucky

William Robert Long, Jr.
Assistant Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, KY 40601-8204

# Supreme Court of Kentucky

### 2005-SC-000879-DG

FLOYD MIKE JONES III                                                                          APPELLANT

ON REVIEW FROM THE COURT OF APPEALS
V.                        CASE NUMBER 2003-CA-002422-MR
MEADE CIRCUIT COURT NO. 01-CI-000117

COMMONWEALTH OF KENTUCKY                                               APPELLEE

**OPINION BY CHIEF JUSTICE LAMBERT
CONCURRING IN PART AND DISSENTING IN PART**

I respectfully dissent from the majority's failure to order re-sentencing of the defendant for the crime of bribing a witness.

The defendant was convicted of twenty-two counts of rape, sodomy, and incest, and of one count of bribing a witness. The jury recommended forty-eight years imprisonment for all convictions, but the trial court imposed a total sentence of ten years. On appeal, this court has vacated all convictions except the conviction for bribing a witness. The vacated convictions will be subject to retrial. Nevertheless, the majority has not required re-sentencing for bribing a witness.

As there is no binding authority on this issue, I have consulted cases from several federal circuits regarding disrupted sentencing packages.[1] From these decisions it appears to be the practice that, whenever a defendant is convicted of more than one count of a multi-count indictment, the district court fashions a sentencing package in which sentences on individual counts are interdependent. When one or more of the counts is later reversed and others are affirmed, the result is an unbundling of the sentencing package. These federal circuits have recognized that an "unbundled" sentencing package undermines the district court's sentencing scheme. Therefore, these cases hold that the entire matter is remanded to the trial court for re-sentencing.

In the case *sub judice*, the trial court could have sentenced the defendant to forty-eight years, but chose instead to sentence him to ten years. It is obvious that the court looked at the totality of the defendant's conduct and fashioned a sentence it believed to be an appropriate societal response. Now that most of the convictions have been vacated and are subject to re-trial, the single affirmed conviction for bribing a witness has become magnified and almost certainly more severe than the trial court intended. In such a circumstance, it would be far better to require re-sentencing upon all convictions after re-trial is complete.

In conclusion, I believe that when a sentencing scheme is disrupted on appeal, and some, but not all of the counts are vacated, it is appropriate to allow the trial court

---

[1] United States v. Shue, 825 F.2d 1111 (7th Cir.), cert. denied, 484 U.S. 956 (1987). Accord United States v. Washington, 172 F.3d 1116 (9th Cir. 1998); United States v. Lail, 814 F.2d 1529 (11th Cir. 1987); United States v. Rosen, 764 F.2d 763 (11th Cir. 1985), cert. denied, 474 U.S. 1061 (1986); United States v. Busic, 639 F.2d 940 (3rd Cir. 1981).

an opportunity to formulate a revised sentencing plan so that the final sentence reflects the exercise of informed trial court discretion. For these reasons, I respectfully dissent.