RENDERED: AUGUST 16, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

2016-SC-000548-MR

FINAL

DATE 9/6/18 Kim Redmon, DC

RODNEY BOWLING                                          APPELLANT

V.
                ON APPEAL FROM CLAY CIRCUIT COURT
               HONORABLE OSCAR G. HOUSE, JUDGE
                       NO. 15-CR-00017

COMMONWEALTH OF KENTUCKY                       APPELLEE

### OPINION OF THE COURT BY JUSTICE WRIGHT

### AFFIRMING

A Clay Circuit Court jury convicted Appellant, Rodney Bowling, of murder, driving under the influence, and two counts of first-degree assault. The jury recommended sentences of thirty years' imprisonment for murder; thirty days' confinement and a $500 fine for driving under the influence; and ten years' imprisonment for each of the two counts of assault. The jury recommended that the sentences run concurrently. Consistent with the jury's sentencing recommendations, the trial court fixed Bowling's sentence at thirty years' imprisonment and a $500 fine. Bowling now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

Bowling asserts six claims of error in his appeal: (1) the trial court erred in denying his motion for a directed verdict as to murder, as he alleges the Commonwealth failed to prove aggravated wantonness; (2) the trial court erred in allowing expert testimony exceeding the scope of the Commonwealth's RCr

7.24(1)(c) disclosure; (3) the trial court erred in the admission of laboratory reports in contravention of his right to confront witnesses against him; (4) the Commonwealth committed prosecutorial misconduct through statements made during its closing argument; (5) the trial court erred in convicting him of both murder and driving under the influence in violation of his right to be free from double jeopardy; and (6) the trial court erred in imposing a fine against him for driving under the influence after determining that he was indigent. For the following reasons, we affirm Bowling's convictions and their corresponding sentences.

## I. BACKGROUND

Bowling was driving in Clay County when his Ford Explorer crossed the center line and struck a Ford Ranger operated by Ronnie Mitchell. Mitchell's girlfriend, Melissa Smith, and their daughter were in the truck with Mitchell. Mitchell died as a result of the injuries he sustained in the collision, and Smith and the couple's daughter were both seriously injured. Bowling was taken to the hospital, where a blood test was collected, revealing that Bowling was under the influence of Xanax at the time of the collision. A few hours after the wreck, Bowling was released from the hospital and consented to a police interview.

Based on the collision, Bowling was indicted by a Clay County Grand Jury of murder, driving under the influence, and two counts of assault. He was convicted of all charges by a Clay Circuit Court jury. Further facts will be developed as necessary in analyzing Bowling's allegations of error.

2

## II. ANALYSIS

### A. Directed Verdict

Bowling argues the trial court erred in failing to direct a verdict on his murder charge. Specifically, Bowling argues the prosecution failed to prove aggravated wantonness. This Court succinctly stated the rule trial courts must follow when faced with motions for directed verdict in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991):

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

Furthermore, "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.*

KRS 507.020(1)(b) states "a person is guilty of murder when . . . [while operating] a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." With this statute in mind, the jury instructions in Bowling's case required the jury to find beyond a reasonable doubt that Bowling: (1) caused the collision resulting in Mitchell's death and (2) that in causing said collision,

3

he wantonly engaged in conduct creating a grave risk of Mitchell's death under circumstances which manifested an extreme indifference to human life.

Melissa Smith testified at trial. She was riding in the truck with Mitchell along with the couple's daughter at the time of the accident which claimed Mitchell's life. She testified that Mitchell had been forced to swerve into the center of the road moments before the accident, as Bowling's vehicle had entered their lane of travel, heading toward them in the wrong direction. She stated Mitchell reduced the speed of his truck and re-entered his lane once Bowling returned to his lane. She testified that Mitchell had slowed his truck to a near stop and pulled onto the shoulder of the road on his side when Bowling again crossed the center line and hit Mitchell's vehicle head-on. Smith stated that she and her daughter were both seriously injured as a result of the accident and that Mitchell was killed.

A Kentucky State Police accident re-constructionist also testified concerning the accident. He testified that, in his expert opinion, Bowling's vehicle struck Mitchell's as Mitchell exited the highway onto the shoulder on Mitchell's side of the road. Bowling's expert accident re-constructionist also agreed that Bowling's vehicle struck Mitchell on Mitchell's side of the road (although he opined the cause of the accident was Mitchell entering Bowling's lane).

Kentucky State Police trooper Baxter testified that Bowling was impaired at the scene—having slurred speech, drooping eyes, excessive slobbering, and a white crust around his mouth. Baxter stated he did not perform any field

4

sobriety tests because medical personnel were examining Bowling and were transporting him to the hospital. Baxter did, however, arrange for hospital staff to take a blood sample from Bowling at the hospital. When Bowling was being discharged from the hospital, Baxter arrested him, as he believed Bowling was impaired. After his arrest, Bowling voluntarily gave an interview, which Baxter recorded. The recording was played for the jury during Baxter's testimony at trial.

The Commonwealth asserts that Bowling admitted during his interview with Baxter to taking several prescription medications on the morning of the collision "including Oxycodone, Neurontin, Xanax, high blood pressure pills, etc." Bowling's counsel argues in his reply brief that he "believes [Bowling] only says that he normally takes those prescriptions in a day and not that he had actually taken all of them that day." However, after listening to the interview, this Court notes that Bowling admitted to having taken at least Xanax and Oxycodone on the day of the incident. In the interview these were the first two drugs Bowling listed as his "regular medications." When Baxter inquired whether Bowling had taken these medications on the day of the collision, Bowling responded affirmatively. Baxter did not ask Bowling whether he had taken any of the other medications he named in the interview on the day of the fatal accident. Later in the interview, Baxter noted Bowling's slurred speech (which this Court also observed in listening to the recording), the fact that Bowling was nodding off, and that Bowling had foam coming from his mouth. Bowling responded that Xanax makes him fall asleep.

5

The Commonwealth also presented the testimony of Courtney Carver, a forensic chemist who works at the Kentucky State Police's central laboratory. She testified her examination of Bowling's blood sample revealed the presence of 133 nanograms per milliliter (ng/ml) of Xanax. She further testified that the initial screening of Bowling's blood revealed the potential presence of opiates and other drugs, but that there was not enough blood in the sample to confirm these initial results.

Dr. Smock, the Commonwealth's forensic toxicology expert, testified that the therapeutic level of Xanax was between 10-40 mg/ml and that no doctor would prescribe Xanax in a dosage that would result in the level present in Bowling's blood. Furthermore, he testified Bowling's level of Xanax constituted an overdose and explained that the slurred speech, drowsiness, and drooling described by Baxter and demonstrated in the taped interview were consistent with a Xanax overdose. Dr. Smock testified that, in his expert opinion, Bowling was impaired due to the ingestion of Xanax and other substances on the night of the collision. He further opined that nothing else in Bowling's hospital records could have led to his impairment.

Bowling presented the testimony of the emergency room doctor, Dr. Vorkdor, who stated Bowling was able to communicate, was coherent, spoke properly, and was alert and conscious at the hospital following the accident. Dr. Vorkdor testified that a urinalysis was done and that it did not show the presence of alcohol or drugs.

While some of the evidence Bowling presented was at odds with the Commonwealth's, this does not mean the trial court's denial of Bowling's directed verdict motion was in error. Rather the trial court was tasked with looking at all evidence in a light most favorable to the Commonwealth. In reaching our holding, we note that "[i]t should be remembered that the trial court is certainly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence. Obviously, there must be evidence of substance." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). Here, the Commonwealth presented such evidence of substance. In drawing "all fair and reasonable inferences from the evidence in favor of the Commonwealth," *Benham*, 816 S.W.2d at 187, the trial court properly denied Bowling's motion.

We hold that, under the evidence as a whole, it would not be clearly unreasonable for a jury to find guilt.

In spite of the Commonwealth's evidence against him, Bowling argues his mere intoxication was not enough to rise to the requisite level of wantonness and that the trial court should have granted his motion for a directed verdict on this ground. "This Court has made clear that intoxication, along with other factors, can suffice to prove the wanton murder element of 'circumstances manifesting extreme indifference to human life.'" *Sluss v. Commonwealth*, 381 S.W.3d 215, 219 (Ky. 2012) (*quoting Hamilton v. Commonwealth*, 560 S.W.2d 539 (Ky. 1977)). Bowling would have this Court hold that the totality of the facts of the present case would not allow the jury to find aggravated

wantonness. Instead, he insists the only theory of wantonness in this case was driving while intoxicated. We disagree.

Both *Sluss* and the case at bar are missing some of the factors which had been used in previous cases to show wantonness. For example, Bowling points this Court to *Hamilton v. Commonwealth*, 560 S.W.2d 539 (Ky.1977). In that case, the defendant was speeding and ran a red light when he caused a fatal collision while driving under the influence. *Id.* Bowling also directs us to *Cook v. Commonwealth*, 129 S.W.3d 351, 363 (Ky. 2004), in support of his theory that his conduct did not rise to the level of wantonness. In *Cook*, this Court held, "[t]here was evidence in this case of both intoxication and excessive speed from which a jury could reasonably infer an extreme indifference to human life." *Id.* There is no evidence that excessive speed played a role in either Sluss's or Bowling's deadly collisions.

> However, as we pointed out in *Sluss*, this Court has not
>
> created a 'checklist' of factors a court must examine when determining whether a wanton murder jury instruction should be given to a jury. While it is certainly true that speeding is a factor that courts have considered, *Hamilton* makes clear that the trial court and the jury must examine the specific facts of each case and make a determination based on the 'totality of the circumstances.'

381 S.W.3d at 220.

Here, Bowling admitted to having taken at least two of his prescribed medications (Xanax and Oxycodone) on the day of the collision. In *Sluss*, this Court held that "even therapeutic doses of certain prescription medications may sufficiently impair someone driving a vehicle. Most prescription

8

medications warn against that precise conduct on the pill bottle." *Id.* at 220.

In that case, Sluss's doctor had discussed the fact that he should not drive while taking his medication—and that fact was among the "other factors" the Court considered in determining Sluss acted wantonly. Bowling points out that there was no evidence in his case that a doctor had spoken to him about the effects of his medications while driving; however, as we stated in *Sluss*, most prescription medications contain warnings concerning driving. What is more, Bowling told Baxter during the police interview that Xanax made him sleepy when Baxter asked him why he was foaming at the mouth and falling asleep. Therefore, much more than a doctor instructing Bowling of the *possible* effects of the drug, Bowling was cognizant of the *actual* effects of the drug he experienced—and chose to operate his vehicle in spite of them.

Bowling also attempts to distinguish our holding in *Sluss* by pointing out that Sluss had admitted to using marijuana earlier in the day, and Bowling had not admitted to any such illicit drug use. While that is technically true, Bowling fails to account for the fact that the jury heard evidence that the level of Xanax in his system was far above the level expected for therapeutic use. In fact, Dr. Smock described it as an overdose level and testified that Bowling's slurred speech, foaming at the mouth, and drowsiness (both as described by Baxter and noticeable on the taped interview) were all in line with a Xanax overdose.

Finally, Bowling points to the fact that Sluss was weaving in and out of traffic while approaching a curve prior to the collision in his case. However,

9

this factor does not distinguish the cases at all. Smith testified that Bowling had crossed the center line before the collision which ended her boyfriend's life. In fact, Smith stated Bowling was driving in their lane to the extent that Mitchell had to leave his lane of traffic and enter Bowling's in order to avoid a collision. Then, after both vehicles had returned to their proper lanes, Smith testified that Mitchell had pulled his vehicle onto the shoulder of the road and slowed to an almost stop when Bowling again crossed the yellow line and the entire oncoming lane before striking Mitchell's truck head-on.

Just as in *Sluss*, the totality of the facts in the present case "would allow a reasonable jury to conclude that Appellant was operating his motor vehicle under circumstances manifesting an extreme indifference to human life." 381 S.W.3d at 220. Therefore, we hold that the trial court did not err in denying Bowling's motion for a directed verdict on the wanton murder charge.

## B. Scope of Expert Testimony

Bowling next argues that the trial court erred in allowing the Commonwealth's expert witness, Dr. Smock, to testify beyond the scope of the Commonwealth's disclosure concerning his opinions. Bowling had made a written request that the Commonwealth provide a summary pursuant to RCr 7.24(1)(c), which reads:

> upon written request by the defense, the attorney for the Commonwealth shall furnish to the defendant a written summary of any expert testimony that the Commonwealth intends to introduce at trial. This summary must identify the witness and describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

10

At trial, Dr. Smock testified extensively concerning the level of Xanax in Bowling's blood at the time of the collision and the effects of the drug. Specifically, he testified that a therapeutic level of Xanax would be between 10 and 40 ng/dl, whereas Bowling's level just over an hour after the collision was 133 ng/dl. Dr. Smock stated no doctor would prescribe Xanax in such a way that Bowling's level would have been this high if he were taking the medication as prescribed. Dr. Smock testified that Xanax, even at therapeutic levels, has several side effects including drowsiness, fatigue, impaired coordination, amnesia, confusion, slurred speech, impaired concentration, dizziness, and double vision. He stated that the drug information accompanying the medication when filled at the pharmacy would have included this list of side effects. Dr. Smock testified that the more of the drug an individual ingests, the more these effects are magnified.

Dr. Smock also testified as to the synergistic effects of Xanax and Oxycodone. Bowling admitted to having taken both these drugs on the day of the collision. According to Dr. Smock, this synergistic effect increases the risk of side effects.

In addition to reviewing Bowling's medical records, Dr. Smock also listened to the taped interview conducted by Baxter. He believed Bowling was "clearly impaired" at the time of the collision. He testified that Bowling's speech during the interview was slurred—consistent with someone who had consumed an excess of Xanax. He also testified that there would have been no great change in the level of Xanax in Bowling's blood between when the blood

11

test was taken and when the collision occurred a little over an hour beforehand, as the half-life of Xanax is 11 hours. Furthermore, Dr. Smock stated that the drooling described by Baxter during the interview would be consistent with a Xanax overdose.

Dr. Smock provided all the above testimony without defense objection. Apparently, this material was all contained within the Commonwealth's RCr 7.24(1)(c) disclosure. However, when the Commonwealth began questioning Dr. Smock concerning Appellant's head injury and diabetes, defense counsel objected. Specifically, Dr. Smock stated that, while Bowling may have had a concussion, one would expect to observe bleeding or bruising on the brain in order to attribute the head injury to behavior matching that exhibited by Bowling. Dr. Smock testified that Bowling's CT scan showed no signs of a severe concussion, and that, while Bowling may have had a slight concussion, it would not have affected his behavior in such a way as evinced on the taped interview. Likewise, Dr. Smock stated that Bowling's blood glucose level of 255 mg/dl would not impact his behavior to the degree demonstrated in the interview.

Defense counsel objected to these portions of Dr. Smock's testimony on the grounds that Dr. Smock's opinions concerning Bowling's head injury and blood glucose level had not been disclosed pursuant to the RCr 7.24(c) motion. The Commonwealth pointed out to the trial court that the defense had presented other theories related to Bowling's actions—such as his concussion

12

and diabetes—and that Dr. Smock's testimony would refute those other causes. The trial court overruled the defense counsel's motion.

Bowling now argues that defense counsel had presented no expert testimony at trial related to Bowling's concussion or diabetes and that the objection should have been sustained. However, while the defense did not have a paid expert who presented these theories, the emergency room doctor who saw Bowling after the collision did testify at trial regarding Bowling's head injury and glucose level. The fact that this evidence did not come in by means of a paid expert witness is immaterial. Once Bowling opened the door to this theory, the Commonwealth was free to refute it through its expert witness. The Commonwealth could not have anticipated the need for this testimony in order to include it in its disclosure.

We review a trial court's evidentiary rulings for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000) "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

In support of his argument, Bowling points this Court to *Barnett v. Commonwealth,* 763 S.W.2d 119, 123 (Ky. 1988), wherein we held "the appellant was entitled under RCr 7.24 to be confronted with the fact that this opinion would be presented against him before the trial started so that he had a reasonable opportunity to defend against the premise." In that case, the defendant was accused of murdering his wife. The Commonwealth presented

13

expert testimony that the traces of blood found on Barnett were consistent with him having washed blood off his hands in a nearby puddle after stabbing his wife. This theory was not contained in the Commonwealth's RCr 7.24 disclosure and this Court held it was reversible error for the trial court to allow its admission for this reason.

However, we believe this case is more in line with *Jones v. Commonwealth*, 237 S.W.3d 153, 158 (Ky. 2007), in which we distinguished *Barnett*, stating, "*Barnett* stands for the principle that an expert may not testify to an additional, undisclosed principle or premise not readily deducible from the conclusions contained in that expert's report. In other words, *Barnett* was based upon our desire to prevent a party from being deliberately surprised at trial." *Id.* (footnote omitted). In *Jones*, the Commonwealth contended that the male DNA present in the victim's vaginal swab matched the appellant. However, the defense expert opined that no male DNA was present on a vaginal swab. This Court stated we could not "perceive how permitting [the defense expert] to explain why he found fault with the Commonwealth's DNA expert's conclusion and/or methodology would have been impermissible 'sandbagging.'" *Id.* at 159. We went on to hold that the trial court's limiting of the defense expert's testimony based on its erroneous finding that his testimony exceeded the scope of the RCr 7.24 disclosure was not harmless beyond a reasonable doubt.

Just as the testimony in *Jones* should have been foreseen by the Commonwealth, Dr. Smock's testimony in the case at bar that excluded other

14

causes for Bowling's behavior during the interview should have been expected by the defense. Dr. Smock testified at length as to his opinion that Bowling's actions were caused by his ingesting an overdose of Xanax prior to the collision which took Mitchell's life. While the defense did not present expert testimony as to whether Bowling's head injury or diabetes were the actual causes of his slurred speech and other mannerisms, it presented testimony that at least pointed to these other conditions. Dr. Smock's testimony was clear that he believed Bowling's ingestion of Xanax and Oxycodone (and potentially other drugs) caused his impairment. Therefore, the defense should not have been caught off guard by his testimony that Bowling's impairment was not brought about by other conditions.

For these reasons, we hold the trial court did not abuse its discretion in allowing Dr. Smock's testimony concerning Bowling's potential head injury and blood glucose level.

## C. Confrontation

Bowling next asserts that the trial court violated his right to confront witnesses, as guaranteed by the Sixth Amendment of the United States Constitution, when it allowed a deputy coroner to testify regarding the results of crash victim Ronnie Mitchell's blood tests. The tests were conducted by a lab in Indiana and showed therapeutic levels of benzodiazepine, opiate, and gabapentin in Mitchell's blood. The deputy coroner testified that his office was required to send blood and urine samples to a laboratory in Indiana for testing in cases such as this and that it had done so. When the prosecution elicited

15

this testimony from the deputy coroner, defense counsel objected, arguing the results were inadmissible and that the witness could not show the integrity of the samples or how they were tested and knew nothing of the laboratory or technicians who processed the sample. The trial court allowed the introduction of the testimony, reasoning that the Commonwealth used such reports for record-keeping.

The Sixth Amendment to the United States Constitution (which was made applicable to the states via the Fourteenth Amendment) provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), the Supreme Court of the Unites States explained that the Sixth Amendment applies to those who "bear testimony" against the accused. *Crawford* went on to explain various forms of testimonial and nontestimonial out-of-court statements, and stated "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59.

The trial court ruled, and the Commonwealth now argues, that the testimony was admissible because it was a record the Commonwealth kept in the normal course of business. We hold that this ruling was in error. Building on its ruling in *Crawford,* the Supreme Court later held:

> Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. *See* Fed. Rule Evid. 803(6). But that is not the case if the regularly conducted

16

> business activity is the production of evidence for use at trial. Our decision in *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), made that distinction clear. There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was "calculated for use essentially in the court, not in the business." *Id.,* at 114, 63 S.Ct. 477.

*Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 321 (2009). Furthermore, the Court went on to specify in *Bullcoming v. New Mexico,* 564 U.S. 647, 661 (2011), that "the analysts who write reports that the prosecution introduces must be made available for confrontation."

We are bound by these holdings of the Supreme Court of the United States when it comes to this federal constitutional issue. Therefore, we hold that the trial court erred in allowing the admission of the statement at issue. Having found error, we must now determine if it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

In *Staples v. Commonwealth,* this court stated, "[h]armless error analysis applied to a constitutional error, such as the Confrontation Clause violation . . . . involves considering the improper evidence in the context of the entire trial and asking whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." 454 S.W.3d 803, 826-27 (Ky. 2014) (internal quotations omitted). Put differently, we have also stated that an error may not be deemed harmless beyond a reasonable doubt

17

unless "there is no reasonable possibility that it contributed to the conviction." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009).

Here, the evidence Bowling complains of consists of blood tests showing that Mitchell had therapeutic levels of three prescription drugs (benzodiazepine, opiate, and gabapentin) in his system the time of the collision. Bowling's defense was that he was not the cause of the accident. Therefore, this evidence would have actually *aided* Bowling in his defense, rather than hindering it. As previously noted, this Court has held that "even therapeutic doses of certain prescription medications may sufficiently impair someone driving a vehicle." *Sluss*, 381 S.W.3d at 220.

In addition to pointing out to the jury that even taken at the prescribed doses, these drugs can cause impairment, Bowling could have explained the synergistic effect of the drugs when taken together, just as Dr. Smock had described. However, Smith provided an eye-witness account as a fellow victim of the collision that Bowling was its cause. That, combined with the overdose level of Xanax in Bowling's bloodstream at the time of the crash, created ample evidence on which the jury could base its verdict.

There was ample evidence against Bowling and any impact of Mitchell's blood test results was negligible (and most likely in Bowling's favor). For these reasons, there is no reasonable possibility the admission of Mitchell's blood tests contributed to Bowling's conviction.

18

## D. Prosecutorial Misconduct

Bowling next argues that two statements the Commonwealth made during its closing argument amounted to prosecutorial misconduct. This issue is unpreserved, but Bowling asks this Court to review it for palpable error pursuant to RCr 10.26. Concerning palpable error, this Court has held:

> An error is "palpable," . . . only if it is clear or plain under current law, *Brewer v. Commonwealth*, 206 S.W.3d 343 (Ky. 2006), and in general a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." *Ernst v. Commonwealth*, 160 S.W.3d 744, 762 (Ky. 2005). . . . An unpreserved error that is both palpable and prejudicial still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice, unless, in other words, the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

*Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009).

In examining the alleged prosecutorial misconduct, we first note that "[a]ny consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial." *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky. 2001) (citing *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky. 1996)). We "may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (citing *Soto v. Commonwealth*, 139 S.W.3d 827, 873 (Ky. 2004)). We must determine "if the misconduct is 'flagrant' or if each of the following three conditions is satisfied: (1) proof of defendant's guilt is not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the error with a

19

sufficient admonishment to the jury." *Barnes v. Commonwealth,* 91 S.W.3d 564, 568 (Ky. 2002) (citing *United States v. Carroll,* 26 F.3d 1380, 1390 (6th Cir. 1994)).

In the present case, the defense did not object to the Commonwealth's closing argument at trial. Therefore, the *Barnes* factors were not met and we must determine whether the Commonwealth's conduct was "flagrant." We consider four factors in making this determination: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Hannah v. Commonwealth,* 306 S.W.3d 509, 518 (Ky. 2010) (superseded by statute on other grounds).

Bowling complains of two statements the Commonwealth made during its closing argument. First, the Commonwealth stated in closing:

> So, you can weigh the credibility of Dr. Smock, who's a retired professor from the University of Louisville Medical School, trained at the University of Louisville Medical School, or this doctor that— uh—his last name I'm not for sure how to say it—it starts with a V—who was trained at some medical school in Liberia. That's on the west coast of Africa. Whether he's a good doctor or not, I don't know. But I do know what Dr. Smock's credentials are and they're excellent.

Bowling asserts that, in making this statement, the prosecution was making improper suggestions "of personal knowledge that a [sic] man from Africa who went to school in Africa was not as good of a doctor as an American who went to school in America." Bowling claims this was an appeal to bias and was "pretty racist."

20

Secondly, Bowling claims the Commonwealth committed prosecutorial misconduct during its closing argument through a statement it made concerning Mitchell's bloodwork. Specifically, the Commonwealth argued that Mitchell was not impaired at the time of the collision because the levels of drugs found in his system were within therapeutic ranges. Bowling argues this is a misstatement of the law.

In examining the four factors for determining whether the Commonwealth's statements were flagrant under *Hannah,* we hold that they were not.

The Commonwealth's remarks did not tend to mislead the jury. As to the credentials of the doctors, we hold that the Commonwealth's statements in this regard did not rise to the level of flagrance and mislead the jury; however, we still voice our disapproval of them. This Court is not in a position to determine whether the Commonwealth's statements concerning Dr. Vorkdor were racially motivated. Because the defense did not object to the Commonwealth's statements in closing, the trial court (which *was* in the best position to make such a determination) did not have a chance to rule on the matter. However, the fact that the Commonwealth could not pronounce Dr. Vorkdor's name, that he went to "some medical school in Liberia" and the geographic location of that country were not relevant. While it is certainly proper to draw comparisons between the training and expertise of witnesses during closing arguments, that comparison should be based on facts. The Commonwealth's remarks were not. The Commonwealth could not have been drawing a comparison when it

21

referred not to a specific school, but rather to "some medical school in Liberia." Furthermore, the Commonwealth was certainly not comparing Dr. Vorkdor's skill and expertise to that of Dr. Smock, when the prosecutor admitted he did not know if Dr. Vorkdor was "a good doctor or not." The Commonwealth could have emphasized the testimony of Dr. Smock and his qualifications without making comments which may have sounded as if they had racist undertones. Here, Dr. Vorkdor was an emergency room doctor in the local community where the collision occurred—therefore, he was apparently qualified to provide Bowling's care. This being so, the interests of professionalism would have been best served had the Commonwealth limited its criticism of Dr. Vorkdor to the subject matter of his testimony.

As to the level of prescription drugs in Mitchell's system, the Commonwealth only stated that Mitchell was not impaired because the level of drugs in his system was within the therapeutic range. While we held earlier that the admission of Mitchell's blood work was in violation of Bowling's Sixth Amendment rights, the intention of this statement was still not to mislead the jury. The Commonwealth was commenting on evidence that had already been admitted in the case and was before the jury. While this Court has said that even therapeutic doses of certain drugs are enough to impair an individual, this statement during closing does not rise to the level of being "flagrant." It draws a contrast between the level of the drugs in Mitchell's and Bowling's systems at the time of the collision.

22

Neither of these remarks were an extensive part of the Commonwealth's closing argument and were isolated in nature. Finally, the evidence against Bowling was strong. An accident reconstructionist and Smith—a passenger in Mitchell's truck—both indicated the accident was Bowling's fault. Blood work revealed an "overdose" level of Xanax in Bowling's system. A doctor testified Bowling's behavior was indicative of a Xanax overdose. Baxter testified regarding Bowling's actions after the collision and during the police interview. Bowling's interview with police was played for the jury, in which Baxter commented on Bowling falling asleep and foaming at the mouth and the jury could hear Bowling's slurred speech.

Even if this Court were to hold that the Commonwealth committed prosecutorial misconduct, any such error would certainly not be palpable. These statements did not "so seriously affect[] the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Jones*, 283 S.W.3d at 668 (quoting *Martin*, 207 S.W.3d at 4).

### E. Double Jeopardy

Bowling argues that his convictions for both wanton murder and driving under the influence violate double jeopardy. He admits this argument is unpreserved. However, this Court has held that the "failure to present a double jeopardy argument to the trial court should not result in allowing a conviction which violates double jeopardy to stand." *Clark v. Commonwealth*, 267 S.W.3d 668, 674–75 (Ky. 2008).

23

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution mandates that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const, amend. V; *see also* Ky. Const. § 13. We have held that the Fifth Amendment and Section 13 of the Kentucky Constitution are "identical in . . . their prohibition against double jeopardy." *Jordan v. Commonwealth,* 703 S.W.2d 870, 872 (Ky. 1985). In *Blockburger v. United States,* the United States Supreme Court held double jeopardy does not occur when a person is charged with two crimes arising from the same course of conduct, so long as each statute "requires proof of an additional fact which the other does not." 284 U.S. 299, 304 (1932).

While Kentucky courts departed from the *Blockburger* rule for a time, this Court stated in *Commonwealth v. Burge*: "we return to the *Blockburger* analysis. We are to determine whether the act or transaction complained of constitutes a violation of two distinct statutes and, if it does, if each statute requires proof of a fact the other does not. Put differently, is one offense included within another?" 947 S.W.2d 805, 811 (Ky. 1996) (internal citations omitted).

Therefore, we must determine whether the statutes for wanton murder and DUI each require proof of a fact the other does not. In order to be guilty of the crime of wanton murder involving operating a vehicle, KRS 507.020(1)(b) states that the driver must operate a vehicle under "circumstances manifesting extreme indifference to human life" and thereby "wantonly engage[] in conduct which creates a grave risk of death to another person and thereby causes the

24

death of another person." The statute regarding driving under the influence, KRS 189A.010, provides in pertinent part, "[a] person shall not operate or be in physical control of a motor vehicle anywhere in this state: . . . (c) [w]hile under the influence of any other substance or combination of substances which impairs one's driving ability . . . ."

In short, in order to convict Bowling of wanton murder, the jury had to find that he operated a motor vehicle under conditions manifesting extreme indifference to human life and that he thereby caused Mitchell's death. The jury did not have to find either of these facts in order to convict Bowling of driving under the influence. Rather, it only had to find that Bowling operated a vehicle while impaired to convict him of the latter crime. Contrary to Bowling's argument to this court, as previously explained, intoxication was but one factor which made Bowling's conduct wanton. For these reasons, Bowling's right to be free from double jeopardy was not violated through his convictions for both wanton murder and driving under the influence.

**F. Fine**

Lastly, Bowling argues the trial court erred by imposing a $500 fine for his conviction for driving under the influence. He concedes this issue is not preserved, but asks this Court to review it pursuant to *Wright v. Commonwealth*, 391 S.W.3d 743, 750 (Ky. 2012) ("Although Appellant admits this error was not properly preserved for review, he is correct in his assertion that this issue may be presented for the first time on appeal.").

25

Appellant argues that, pursuant to KRS 534.040(4), the court erred in imposing a $500 fine upon him, as it had determined he was indigent pursuant to KRS Chapter 31. We disagree. This Court recently addressed this very issue in *Commonwealth v. Moore*, 545 S.W.3d 848, 850–51 (Ky. 2018):

> By its plain language, the fines that KRS 534.040 requires for misdemeanor offenses do not apply to crimes that are defined outside the penal code. By its own clear language, the indigency exemption of subsection (4) applies only to "fines required by" KRS 534.040. In other words, the plain language of the statute grants an indigency exemption *only* for misdemeanors defined within the penal code and for which KRS 534.040 establishes the applicable fines. We find no ambiguity, and so, there is no alternate reading of the statute that would lead us to a different construction.
>
> KRS Chapter 189A, rather than the Kentucky Penal Code, provides the body of law that primarily governs the offense of driving under the influence. KRS 189A.010(1) defines the conduct that constitutes the crime of DUI. KRS 189A.010(5) states with particularity the fines that may be imposed for DUI. . . . Specifically, KRS 189A.010(5)(a) provides that for a first DUI offense within a ten-year period, the offender shall be fined not less than $200 nor more than $500.

With this precedent in mind, we hold that the trial court did not err in imposing the $500 fine on Bowling for driving under the influence.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court as to Bowling's convictions and corresponding sentences.

All sitting. All concur.

26

COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

William Robert Long Jr.
Assisstant Attorney General