# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 18, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0033-MR

KENDALL D. LINCOLN                                                                  APPELLANT

V.

ON APPEAL FROM HARDIN CIRCUIT COURT
HONORABLE KEN M. HOWARD, JUDGE
NO. 19-CR-01249

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

As a matter of right,[1] Kendall D. Lincoln appeals the judgment reflecting his convictions for murder, first-degree robbery, and of being a convicted felon in possession of a handgun. Finding no reversible error, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

While visiting his grandmother in Hardin County, Lincoln posted on Snapchat a picture of himself with marijuana as an advertisement to potential buyers. Cornelius Tory replied. Tory offered to trade Lincoln three bottles of promethazine in exchange for one ounce of marijuana. The men agreed to make the exchange in the parking lot of the Radcliff Wal-Mart.

---

[1] Ky. Const. § 110(2)(b).

Lincoln rode with his friend Ladarius Archie and Archie's girlfriend, who were headed to Wal-Mart to get food. After waiting in the Wal-Mart parking lot for some time, Tory flashed the lights of his car at the SUV driven by Archie. Archie drove toward Tory's vehicle and parked on the passenger side of Tory's car.

Lincoln exited Archie's SUV and approached the passenger side of Tory's car. A few seconds later, Lincoln fatally shot Tory. Lincoln then grabbed items from Tory's car and returned to Archie's SUV. Archie then drove Lincoln to the home of R.J. Mooring, a friend of Lincoln's. After learning what had happened, Mooring called Jalen Pendleton and asked Pendleton to take Lincoln to a motel.

The next day, Mooring and his father visited the Radcliff police department. Mooring identified Lincoln as the shooter responsible for Tory's death. Kentucky State Police attempted to locate Lincoln at his grandmother's home. While surveilling her home, officers observed Lincoln enter a car. The police performed an interdiction stop and discovered that Lincoln's uncle drove the car and Lincoln was a passenger.

The police arrested Lincoln. At first, police told Lincoln that he was being arrested for an outstanding warrant on an unrelated charge. During an interview with Det. Levi Mattingly, Lincoln first denied any knowledge of the shooting in the Wal-Mart parking lot. After Det. Mattingly confronted Lincoln about security-camera footage from the Wal-Mart parking lot, Lincoln admitted that he met Tory at the Wal-Mart parking lot to exchange drugs. Lincoln claimed that he shot Tory in self-defense.

At trial, the Commonwealth posited that Lincoln intended to rob and murder Tory all along. In support of this theory, the Commonwealth was permitted to introduce evidence under Kentucky Rule of Evidence (KRE) 404(b) indicating that, during the same week as the underlying offense, Lincoln obtained eight ounces of marijuana by robbing an unrelated individual. Essentially, the Commonwealth theorized that Lincoln engaged in a pattern and practice of robbing individuals to obtain drugs.

Lincoln maintained his defense of self-defense, arguing that he feared for his life because Tory pointed a handgun at him during the drug exchange.

The jury convicted Lincoln on all charges. Now, Lincoln makes several assertions of trial-court error. He urges reversal and remand for a new trial. We consider each assertion of error below.

## II. ANALYSIS

### A. The trial court did not abuse its discretion by permitting introduction of KRE 404(b) information.

KRE 404(b)(1) makes evidence of prior crimes, wrongs, or acts inadmissible to show the character of a person or action in conformity therewith. But prior-bad-acts evidence may be offered "for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[2]

---

[2] KRE 404(b)(1).

We review a trial court's evidentiary rulings for abuse of discretion.[3] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[4]

"[T]rial courts must apply KRE 404(b) cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime."[5] "To determine whether evidence of prior bad acts is admissible, we must decide if the evidence is relevant 'for some purpose other than to prove the criminal disposition of the accused[,]' probative as to the actual commission of the prior bad act, and not overly prejudicial under KRE 403."[6]

The Commonwealth filed a notice of intent to introduce evidence under KRE 404(c). Specifically, the Commonwealth planned to introduce evidence that, during the same week as the charged offense, Lincoln allegedly robbed another individual, obtaining eight ounces of marijuana. Lincoln objected. The trial court conducted an evidentiary hearing to evaluate the possibility of undue prejudice posed by introduction of the prior-bad-acts evidence. During the hearing, R.J. Mooring testified that he exchanged text messages with Lincoln in which Lincoln stated, "I was supposed to stain Anthony nobody

---

[3] *Kerr v. Commonwealth*, 400 S.W.3d 250, 261 (Ky. 2013).

[4] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)

[5] *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994) (alteration in original omitted).

[6] *Kerr*, 400 S.W.3d at 260 (quoting *King v. Commonwealth*, 276 S.W.3d 270, 275 (Ky. 2009)).

else." Mooring testified that he understood the word "stain" to mean Lincoln was going to "take, rob, or steal" from Anthony. Another text from Lincoln to Mooring stated, "I do this shit and you know that." The trial court concluded that Lincoln's prior conduct was sufficiently similar to the circumstances presented in this case to be introduced as "a common scheme or plan, motive, intent, and/or absence of mistake."

At trial, R.J. Mooring testified that a few days before the Wal-Mart parking-lot shooting, Lincoln admitted that he had taken about eight ounces of marijuana from another dealer. Essentially, the Commonwealth's theory of the case was that Lincoln engaged in a scheme or plan to obtain drugs through robbery. In other words, the Commonwealth argued that Lincoln similarly planned to rob Tory to obtain drugs.

The trial court did not abuse its discretion by allowing introduction of this prior-bad-acts evidence under KRE 404(b). First, the evidence of the prior armed robbery was relevant to the Commonwealth's theory of Lincoln's motive, preparation, and plan. Second, the evidence was probative as to the commission of the prior-bad act. The Commonwealth's theory was that Lincoln engaged in a pattern and practice of obtaining drugs through robbery. The evidence demonstrates that Lincoln allegedly committed a prior robbery in which he obtained drugs. Lastly, the evidence was not substantially more prejudicial than probative under the KRE 403 balancing test. The evidence introduced by the Commonwealth was that Lincoln committed a robbery close in time to the shooting at issue in this case and that Lincoln obtained drugs in

5

both incidents. That evidence rebuts Lincoln's assertion of self-defense and is probative of the Commonwealth's theory that Lincoln engaged in a plan or scheme to obtain drugs through robbery.

Importantly, the trial court gave two limiting instructions regarding the proper scope of 404(b) evidence. The trial court admonished the jury not to consider the prior-bad-acts evidence for any purpose except insofar as it showed a motive or intent on Lincoln's part to commit the charged offenses. We presume that jurors follow a court's admonitions.[7]

Ultimately, the prior-bad-acts evidence introduced here is directly relevant to the Commonwealth's theory concerning Lincoln's plan, preparation, and motive. And the trial court admonished the jury twice with limiting instructions regarding the proper scope of the prior-bad-acts evidence. As such, the trial court did not abuse its discretion by admitting evidence of the prior robbery under KRE 404(b)(1).

**B. The trial court did not abuse its discretion by precluding hearsay testimony during the cross-examination of Ladarius Archie.**

During defense counsel's opening argument, counsel stated, "And [Lincoln] gets back in the car, and you're going to hear Ladarius Archie, and [Lincoln] says, 'He tried to up on me, he tried to rob me.'" Essentially, the defense planned on eliciting testimony from Archie on cross-examination that Lincoln told Archie that Tory tried to attack or rob him just before the shooting.

---

[7] *Tamme v. Commonwealth*, 873 S.W.2d 13, 26 (Ky. 1998).

6

On direct examination, the Commonwealth did not ask Archie about the statement that Tory "tried to up" on Lincoln. Before the defense's cross-examination, the Commonwealth preemptively objected to the defense eliciting any testimony from Archie regarding Lincoln's statement when Lincoln returned to Archie's vehicle after shooting Tory. The Commonwealth argued that the prospective testimony did not fit into any hearsay exception. The Commonwealth also described the statement as "self-serving." In response, defense counsel stated that "Archie actually gave testimony previously that the defendant said this, that Mr. Tory 'upped' on him." Defense counsel argued that under the old rules of evidence a defendant's statement against interest could be admitted but that "any statement by the defendant is admissible" under the hearsay rules.

Outside the presence of the jury, the trial court explained that under the current rules of evidence a statement that constitutes hearsay must fit into an exception to the hearsay rule to be admitted as evidence. The trial court went on to explain that a defendant cannot introduce the defendant's own "self-serving" out-of-court statement through another witness's testimony without testifying and being subject to cross examination. The trial court concluded by saying, "The Commonwealth can object and, unless it's necessary for context, it doesn't come in."

The defense then cross-examined Archie as follows:

**Defense:** Okay. So, when Kendall got back into the vehicle, you testified that he said "go go go" right or –
**Archie:** Yeah, he was just like "go, don't say nothing just go."
**Defense:** "Don't say nothing just go." That was all he said?

7

**Archie:** Yes.
**Defense:** He didn't say anything else to you?
**Archie:** No.
**Commonwealth:** Judge, objection.
**Judge:** What's the objection?
**Commonwealth:** I think we're trying to get in hearsay.
**Judge:** Well, it hasn't occurred yet.  Overruled.

Defense counsel did not make any additional references to or attempt to impeach Archie with Lincoln's statement that Tory "tried to up on him."

This issue requires two analyses.  First, we must determine whether this issue was properly preserved for appellate review.  Then, applying the appropriate standard of review, we must consider whether reversible error occurred.

That "[a] new theory of error cannot be presented on appeal" is a well-settled rule.[8]  This rule applies "both as to the matter objected to and as to the grounds of the objection."[9]  "It must appear that the question was fairly brought to the attention of the trial court. . . . One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of."[10]

Lincoln raises this assertion of error for the first time on appeal.  It is true that defense counsel objected to the Commonwealth's request for exclusion and that the Commonwealth argued broadly that no exception to the hearsay rule existed to allow Archie's testimony regarding Lincoln's statement.

---

[8] *Ruppee v. Commonwealth*, 821 S.W.2d 484, 486 (Ky. 1991) (citations omitted); *see also Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1977).

[9] *Tucker v. Commonwealth*, 916 S.W.2d 181, 183 (Ky. 1996).

[10] *Id.*

8

Even so, the discussion and analysis before the trial court focused exclusively on whether Lincoln's statement could be admitted as a statement against interest. Lincoln now argues—for the first time on appeal—that his statement to Archie that Tory "tried to up on him" can be admitted under the excited utterance exception to the hearsay rule. As a result, the question of whether the statement could be admitted as an excited utterance was not brought to the attention of the trial court and is therefore not preserved for appellate review.

So we review for palpable error. Under Kentucky Rule of Criminal Procedure (RCr) 10.26, "an unpreserved error may generally be noticed on appeal *if* the error is palpable and *if* it affects the substantial rights of a party."[11] A palpable error is "easily perceptible, plain, obvious and readily noticeable."[12] "Even then, relief is appropriate only upon a determination that manifest injustice resulted from the error."[13] Manifest injustice is present when a "defect in the proceeding [exists that is] shocking or jurisprudentially intolerable."[14]

We cannot conclude that the trial court committed palpable error by precluding Archie's testimony about Lincoln's statement that Tory "upped on [Lincoln]." It is not plain, obvious, or readily noticeable that Lincoln's

---

[11] *Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013) (internal quotations omitted) (emphasis in original).

[12] *Id.*

[13] *Id.*

[14] *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

statement would be admitted as an excited utterance. Even assuming Lincoln

made the statement shortly after shooting Tory, Lincoln stole a bottle of

promethazine before returning to Archie's vehicle, indicating that some time

elapsed between the shooting and Lincoln's statement to Archie, which may

contradict Lincoln's argument that he made the statement under stress or

excitement.  Regardless, the preclusion of Archie's testimony did not result in

manifest injustice because Lincoln himself twice testified that he told Archie

that Tory "tried to up on him."  Since the precluded evidence is cumulative of

other evidence that was introduced at trial, no manifest injustice resulted from

its preclusion during Archie's cross-examination.

### C. Introduction of Lincoln's status as a convicted felon was not reversible error.

As the trial began, the trial court noted that Lincoln was charged with

being a convicted felon in possession of a handgun in addition to the murder

and robbery charges.  Accordingly, the trial court did not read to the jury the

indictment language naming the felon-in-possession charge and properly

bifurcated the guilt phase of the trial.  No parties objected.

Still, the Commonwealth questioned Lincoln on cross-examination as

follows:

> **Commonwealth:** This should've never occurred to begin with, right?
> **Lincoln:** No, sir.
> **Commonwealth:** This whole incident, correct?
> **Lincoln:** Yes, sir.
> **Commonwealth:** You weren't supposed to have a gun, were you?
> **Lincoln:** No, sir.
> **Commonwealth:** It's illegal for you to own a gun, correct?
> **Lincoln:** Yes, sir.

10

**Commonwealth:** Because why?  Tell the ladies and gentlemen of the jury why.

Before Lincoln could answer the Commonwealth's last question above, the defense objected.  During a bench conference, defense counsel stated that the Commonwealth could ask whether Lincoln was a convicted felon but requested a limiting instruction be given to the jury to ensure the evidence was considered for a proper purpose.  In response, the trial court told the Commonwealth that, "[a]t this stage, the proper procedure is to ask him are you a convicted felon."

The Commonwealth's cross-examination resumed as follows:

**Commonwealth:** It's because you're a convicted felon, correct?
**Lincoln:** Yes, sir.
**Court:** Ladies and gentlemen of the jury, I need to advise you, give you another limiting instruction at this time.  The fact that this defendant has been previously convicted of a felony is not to be considered by you to any degree as evidence of defendant's guilt in this case.  That only insofar as it may have a bearing, if it does, upon the defendant's truthfulness as a witness and the weight to be given his testimony.
**Commonwealth:** So, let me get this straight.  Ladarius Archie testified your kid was not there.  You're saying your kid was there, right?
**Lincoln:** Yes, sir.
. . .
**Commonwealth:** You left your child there to do a drug deal, correct?  You not only left your child to go do a drug deal, you left illegally carrying a firearm?  Can you agree with me that if you did not have a firearm that night that Cornelius Tory would still be here?
**Lincoln:** Yes.

Then, during closing arguments several days later, the Commonwealth said, "He's a convicted felon carrying a 45 loaded Glock 30.  It is a felony for him to even be in possession of it."

Lincoln contends that the prosecution committed reversible error by introducing evidence of the bifurcated felon-in-possession charge during Lincoln's cross-examination and during the Commonwealth's closing arguments in the initial guilt phase of the trial.

Regarding the Commonwealth's questions asked on cross-examination, KRE 609(a) permits a party to ask witnesses if the witness is a convicted felon.[15] And the trial court gave a proper limiting instruction admonishing the jury that the fact that Lincoln was a convicted felon was not to be considered as evidence of guilt but only insofar as it may have bearing on Lincoln's truthfulness as a witness and the weight to be given to his testimony. As such, any prejudice to Lincoln because of the Commonwealth's cross-examination was cured by the trial court's limiting instruction.[16]

Even so, Lincoln contends that the Commonwealth's statement during cross examination, that it was "a felony for [Lincoln] to even be in possession of [a firearm]," constitutes flagrant prosecutorial misconduct. In examining alleged prosecutorial misconduct, "any consideration on appeal of alleged

---

[15] "General rule. For the purpose of reflecting upon the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record if denied by the witness, but only if the crime was punishable by death or imprisonment for one (1) year or more under the law under which the witness was convicted. The identity of the crime upon which conviction was based may not be disclosed upon cross-examination unless the witness has denied the existence of the conviction. However, a witness against whom a conviction is admitted under this provision may choose to disclose the identity of the crime upon which the conviction is based." KRE 609(a).

[16] *See Tamme*, 873 S.W.2d at 26 ("Jurors are presumed to have followed an admonition.").

12

prosecutorial misconduct must center on the overall fairness of the trial."[17] "We may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings."[18] "We must determine if the misconduct is 'flagrant' or if each of the following three conditions is satisfied: (1) proof of defendant's guilt is not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the error with a sufficient admonishment to the jury."[19]

Because defense counsel did not object to the Commonwealth's closing argument at trial, we must determine whether the Commonwealth's conduct was "flagrant."[20] "We consider four factors in making this determination: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused."[21]

First, the remarks did not tend to mislead the jury or prejudice the accused. Lincoln's theory of the case was that he shot Tory to death with a handgun in self-defense. So the fact that Lincoln possessed a firearm was not in dispute. The only new information elicited and highlighted by the

---

[17] *Bowling v. Commonwealth*, 553 S.W.3d 231, 242 (Ky. 2018) (internal quotations and alteration omitted).

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

13

Commonwealth was that Lincoln was a convicted felon. The Commonwealth was entitled to elicit this information under KRE 609. That evidence is insufficient to demonstrate that the Commonwealth's reference to this fact prejudiced Lincoln. So this factor weighs against a finding of flagrant prosecutorial misconduct.

Second, there were three references to Lincoln's illegal possession of a firearm during the entire trial. As such, the remarks made by the Commonwealth, while not necessarily fleeting or isolated, were also not repetitive and did not pervade the entire trial. So this factor is neutral on a finding of prosecutorial misconduct.

Third, the Commonwealth deliberately placed the fact that Lincoln was a felon in possession of a firearm in front of the jury. This is evidenced by the fact that the Commonwealth initiated its cross-examination of Lincoln with the fact that he was a convicted felon, highlighted the fact that he illegally owned a firearm later during cross-examination, and mentioned the fact during closing arguments. So the third factor weighs in favor of a finding of flagrant misconduct.

Fourth, and finally, evidence of Lincoln's guilt was strong. Lincoln did not dispute that he shot and killed Tory with a firearm during a drug deal in the Radcliff Wal-Mart parking lot. And Lincoln claims that he shot Tory in self-defense. So the only question for the jury was whether they believed Lincoln's assertion that he shot Tory in self-defense. As such, the final factor weighs against a finding of flagrant prosecutorial misconduct.

14

In sum, only one factor weighs in favor of finding flagrant prosecutorial misconduct. On balance and considering the evidence, while we do not condone the Commonwealth's references to Lincoln's illegal use of a firearm, we cannot conclude that the Commonwealth engaged in flagrant prosecutorial misconduct that would necessitate reversal.

**D. The Commonwealth's misstatement regarding the duty to flee or retreat under Kentucky law was not flagrant prosecutorial misconduct.**

During closing arguments, the Commonwealth stated, "Because you have a duty to flee, you have a duty to retreat in the state of Kentucky if you can." Lincoln concedes that this issue is not preserved, so we review here for palpable error.

The Commonwealth's statement regarding a duty to flee was an easily perceptible, plain, obvious, and readily noticeable misstatement of Kentucky law.[22] Kentucky's common law is well-settled that one has no duty to retreat before using physical force for self-protection.[23] The common law rule is codified in Kentucky Revised Statutes (KRS) 503.050(4), which states, "A person does not have a duty to retreat prior to the use of deadly physical force."

The Commonwealth conflates two related but distinct legal concepts in arguing that the prosecutor's comment was a correct statement of Kentucky

---

[22] *See Martin*, 409 S.W.3d at 344 (Ky. 2013) (explaining that a palpable error is one that is "easily perceptible, plain, obvious and readily noticeable").

[23] *Commonwealth v. Stone*, 291 S.W.3d 696, 703 (Ky. 2009) (quoting *Gibson v. Commonwealth*, 34 S.W.2d 921, 926 (Ky. 1931) ("It is a tradition that a Kentuckian never runs. He does not have to.")).

15

law.  The Commonwealth correctly notes that criminal defendants are not entitled to a "no duty to retreat" jury instruction when engaged in unlawful activity at the time force was used.[24]  But Lincoln does not argue he was entitled to a "no duty to retreat" jury instruction.  Instead, he argues that the Commonwealth misstated Kentucky law during closing arguments by telling the jury that Lincoln had an affirmative duty to flee or retreat under Kentucky law.  On that point, Lincoln is correct.  This Court has recently explained that Kentucky's no-duty-to-retreat rule is a creature of statute that is distinct from a "no duty to retreat" jury instruction.[25]  As a result, the Commonwealth's comment regarding Lincoln's duty to retreat constituted a misstatement of Kentucky law.

But that does not end our analysis.  "As we review for palpable error, we will reverse only if the alleged misconduct was flagrant or, where a contemporaneous objection was made, the proof of guilt is not overwhelming and the trial court failed to cure the misconduct with a sufficient admonition."[26]  Here, since the defense made no contemporaneous objection to

---

[24] See KRS 503.055(3) ("A person *who is not engaged in an unlawful activity* and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force." (emphasis added)); *see also Curry v. Commonwealth*, 620 S.W.3d 563, 567–68 (Ky. 2020); *Jackson v. Commonwealth*, 481 S.W.3d 794, 796–97 (Ky. 2016).

[25] *See Curry,* 620 S.W.3d at 570.

[26] *Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020) (citing *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016); *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)).

16

the Commonwealth's misstatement during closing arguments, "we must find the misconduct flagrant in order to reverse on this claim of error."[27] "We consider four factors in making this determination: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused."[28]

First, while the Commonwealth misstated the law during its closing argument, the trial court instructed the jury on the law regarding self-protection and informed the jurors that they were to follow the trial court's jury instructions as the law of the Commonwealth. So any conceivable error that misled the jury as to the applicable law or prejudiced the defendant was remedied by the trial court's affirmative statement of the law of the Commonwealth.

Second, the Commonwealth appears to have only made one misstatement regarding the duty to retreat under Kentucky law. As a result, we cannot say that one discrete misstatement over the course of a lengthy trial constitutes extensive remarks that would support a finding of flagrant prosecutorial misconduct.

Third, the Commonwealth's misstatement regarding Kentucky law was made during closing arguments, which the prosecution almost certainly

---

[27] *Id.*

[28] *Bowling,* 553 S.W.3d at 242.

17

planned and rehearsed before the closing arguments were given. As a result, this factor weighs in favor of a finding of flagrant misconduct.

Fourth, as previously mentioned, there was strong evidence of Lincoln's guilt. Again, Lincoln did not dispute that he shot and killed Tory with a handgun during a drug deal in the Radcliff Wal-Mart parking lot. Instead, he argued that he shot Tory in self-defense. Even so, the prosecution introduced evidence to the contrary, which suggested that Lincoln engaged in a pattern and practice of committing robbery to obtain drugs. As a result, the only question for the jury was whether they believed that Lincoln shot Tory in self-defense. So the fourth factor weighs against finding flagrant prosecutorial misconduct.

On balance, three of the four factors weigh against finding flagrant prosecutorial misconduct arising from the Commonwealth's misstatement of Kentucky law. As a result, the Commonwealth's misstatement of law regarding the duty to retreat was not flagrant prosecutorial misconduct, and reversal is inappropriate.

### E. The trial court's failure to instruct on self-protection was not palpable error.

Lincoln argues that the trial court erred by failing to provide a separate jury instruction on self-protection under Kentucky law. This error is not preserved for appellate review. Lincoln argues that the error is preserved because both parties tendered proposed jury instructions to the trial court. Additionally, Lincoln notes that the trial court reviewed instructions with counsel on Friday afternoon and that defense counsel renewed previous

objections to the jury instructions when trial reconvened the following Monday morning but only specifically mentioned the inclusion of the initial-aggressor instruction.

After review of the record, other than submitting proposed jury instructions to the trial court, Lincoln did not specifically request that the trial court separate the instruction on self-protection. Again, new theories of error cannot be presented for the first time on appeal.[29] Objections must be "fairly brought to the attention of the trial court. . . . One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of."[30] Here, the fact that Lincoln included a separate jury instruction for self-protection in his proposed jury instructions does not constitute a specific objection to the trial court's failure to set that instruction out as a separate jury instruction. Defense counsel had ample opportunity to review and object to the trial court's proposed final draft of the jury instructions. By Lincoln's own admission, the only specific objection that defense counsel made was to the trial court's proposed initial aggressor instruction. As a result, this claim of error is unpreserved, and we review for palpable error.

The trial court's failure to set out a separate jury instruction for self-protection is not a plain or obvious error.[31] Lincoln does not contend that the

---

[29] *Ruppee*, 821 S.W.2d at 486.

[30] *Tucker*, 916 S.W.2d at 183.

[31] *See Martin*, 409 S.W.3d at 344 (Ky. 2013) (explaining that a palpable error is one that is "easily perceptible, plain, obvious and readily noticeable").

19

jury instructions included an incorrect definition of self-protection under Kentucky law.  Instead, he argues that the court erred by failing to set out a separate jury instruction on self-protection.  It is true that *Commonwealth v. Hager* discusses a separate jury instruction on self-protection.[32]  Even so, *Hager* did not hold that a self-protection instruction must be provided separately.  As a result, we cannot conclude that the trial court committed palpable error by failing to set out a separate self-protection instruction when the court included the definition of self-protection as part of Instruction No. 2.

**F. The trial court did not abuse its discretion in admitting the testimony of Lt. Davis.**

Lincoln argues that the trial court abused its discretion in permitting opinion testimony from Lt. Davis that Lincoln did not exhibit any symptoms of shock.  During opening statement, defense counsel mentioned that Lincoln was "shocked" by Tory's attempt to rob him.  Subsequently, the Commonwealth questioned Lt. Davis, who transported Lincoln from the site of the interdictory stop to the police station, about Lincoln's demeanor.  Lt. Davis testified that he was trained to recognize whether someone is suffering from shock.  The Commonwealth asked Lt. Davis if, during the time he spent with Lincoln, Lincoln exhibited any symptoms of someone suffering from shock.  The defense objected because Lt. Davis was not an expert witness and on the grounds that the testimony was improper because it would require Lt. Davis to testify about Lincoln's state of mind.  The trial court overruled the defense objection.  Lt.

---

[32] 41 S.W.3d 828, 846 (Ky. 2001).

Davis then said, "[Lincoln] did not exhibit any signs of shock that I have been familiar with or exposed to."

"As a general rule, a competent witness may testify concerning matters of which he [or she] has personal knowledge, including events he has personally observed and perceived."[33] Furthermore, "a witness may describe another person's 'conduct, demeanor, and statements based upon his or her observations to the extent that the testimony is not otherwise excluded by the Rules of Evidence.'"[34] And "[w]e have long allowed lay witnesses to testify as to their opinion on a defendant's sanity or mental state" so long as "the witness [has] a sufficient basis on which to form his or her opinion."[35]

The trial court did not abuse its discretion in permitting Lt. Davis to testify about his observation that Lincoln was not exhibiting signs of shock. Lt. Davis spent at least a half-hour with Lincoln. Moreover, Lt. Davis testified that he was trained to recognize symptoms of shock. These facts provide a sufficient basis on which Lt. Davis could form an opinion on whether Lincoln was exhibiting symptoms of shock. Ultimately, Lt. Davis's observation that Lincoln was not exhibiting symptoms of shock was within the realm of Davis's common personal knowledge.

This case is dissimilar to *Ordway*. Contrary to the testimony in *Ordway*, which involved the opinion of an experienced police detective that a defendant's

---

[33] *Ruiz v. Commonwealth*, 471 S.W.3d 675, 683 (Ky. 2015).

[34] *Id.* (quoting *Ordway v. Commonwealth*, 391 S.W.3d 762, 777 (Ky. 2013) (alteration omitted)).

[35] *Hall v. Commonwealth*, 468 S.W.3d 814, 833 (Ky. 2015).

21

conduct did not comport with the stereotypical conduct of one acting in self-defense, Lt. Davis was neither asked to comment on matters outside the realm of his common knowledge nor to testify about Lincoln's guilt or innocence.[36] Additionally, unlike the testimony in *Ordway*, Lt. Davis's testimony was more limited and subject to an important qualifier. Lt. Davis ultimately testified that "[Lincoln] did not exhibit any signs of shock *that I have been familiar with or exposed to.*" As such, Lt. Davis only testified that Lincoln was not exhibiting any symptoms of shock with which he was familiar. That does not foreclose that Lincoln was not exhibiting symptoms of shock outside of Lt. Davis's common knowledge and is a far cry from the testimony in *Ordway*, where a detective opined that the defendant did not exhibit the stereotypical conduct of a person acting in self-defense.[37]

Finally, any error resulting from Lt. Davis's testimony was harmless because it was cumulative of other evidence presented at trial. Det. Mattingly testified, without objection, that Lincoln was initially lighthearted and jovial before his police interview. More importantly, Det. Mattingly testified, without objection, that Lincoln exhibited no signs of shock. Since "the erroneous admission of cumulative evidence is a harmless error,"[38] admission of Lt.

---

[36] *See Ordway v. Commonwealth*, 391 S.W.3d 762, 776–77 (Ky. 2013).

[37] *See id.*

[38] *Torrence v. Commonwealth*, 269 S.W.3d 842, 846 (Ky. 2008); *see also Wells v. Commonwealth*, 206 S.W.3d 332, 335–36 (Ky. 2006) (Minton, J., concurring, joined by three other justices, stating that the erroneous admission of cumulative evidence is harmless error) (citing *Meadows v. Commonwealth*, 178 S.W.3d 527, 538 (Ky. App. 2005); *Combs v. Commonwealth*, 965 S.W.2d 161, 165 (Ky. 1998)).

Davis's testimony that Lincoln was not exhibiting signs of shock was, at most, harmless error.

### G. Admission of the Wal-Mart asset-protection employee's testimony was not palpable error.

Gina Nichols worked for Wal-Mart asset protection at the time of the shooting but was employed by the Radcliff Police Department at the time of Lincoln's trial. Nichols made a recording of the surveillance video from the Wal-Mart parking lot. She testified that she only made a recording of events during the crime. The recording stopped after the second vehicle drove away.

The Commonwealth asked Nichols to tell the jury what she saw on the video after the recording stopped. Nichols testified that she saw two men walking to the store hesitate, continue into the store, and upon leaving the store, one man walking toward Tory's car. Nichols testified that the man looked toward Tory's car, then turned and ran. Police arrived a few minutes later. Nichols testified that neither of the men on the video opened the door of Tory's car but acknowledged that the passenger side of Tory's vehicle was not visible on the video. She said she watched the video until police arrived on scene.

Lincoln concedes that this error is unpreserved; thus, we review for palpable error. KRE 701 limits opinion testimony by a lay witness to opinions and inferences that are: "(a) Rationally based on the perception of the witness; (b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) Not based on scientific, technical, or

other specialized knowledge within the scope of Rule 702." And KRE 602 requires a witness to have personal knowledge before testifying about a matter.

Admission of Nichols's testimony regarding her observations of events on the surveillance video after the video recording stopped was not an "easily perceptible, plain, obvious and readily noticeable error."[39] This Court explained that "[w]hile a witness may proffer narrative testimony within the permissible confines of the rules of evidence, we have held he [or she] may not 'interpret' audio or video evidence, as such testimony invades the province of the jury, whose job is to make determinations of fact based upon the evidence."[40] The problem here, however, is that during the portion of Nichols's testimony at issue, she was not interpreting or narrating video evidence. Instead, Lincoln takes issue with Nichols's explanation of the portion of the Wal-Mart surveillance video that was *not* shown to the jury. Nichols testified that she personally observed the video surveillance evidence from the time the second car (presumably Archie's vehicle) drove off until police arrived. And Nichols testified that she was familiar with the Wal-Mart parking lot and the video surveillance system. So it appears that Nichols personally observed the video and had personal knowledge about the video surveillance system and the layout of the Wal-Mart parking lot. On these facts, we cannot say that it was a palpable error to allow Nichols to testify about her observations on the surveillance video after the recording that was shown to the jury stopped.

---

[39] *See Martin*, 409 S.W. 3d at 344 (providing the standard for a "palpable" error).

[40] *Cuzick v. Commonwealth*, 276 S.W.3d 260, 265–66 (Ky. 2009).

Furthermore, even if Nichols's testimony constituted error, it did not result in manifest injustice.[41]  Again, it was undisputed that Lincoln met Tory in the Radcliff Wal-Mart parking lot to conduct a drug transaction, that he shot Tory, and that he left the scene.  The only issue at trial was whether the jury believed that Lincoln shot Tory in self-defense.  Lincoln states that the medical examiner thought one bullet-entrance wound was on Tory's back, which would have been the fatal wound.  And Lincoln argues that the Commonwealth failed to demonstrate how Tory could have been shot in the back from the passenger seat.  Still, Lincoln made no serious contention at trial that someone else shot Tory, causing his death.  As a result, we cannot say that the admission of Nichols's testimony resulted in manifest injustice where there was no evidence suggesting another shooter shot Tory or disturbed the crime scene.

## H. The trial court did not err in denying suppression of Lincoln's statement to Det. Mattingly.

Lincoln argues that the trial court erred in denying his motion to suppress his statement given to Det. Mattingly at the police station.  Lincoln contends that he was ostensibly arrested on a violation related to a case on pretrial diversion and he had counsel related to that case.  Lincoln's attorney in that case testified that he called the Radcliff Police Department two or three times but was not allowed to speak to Lincoln.

---

[41] *See Martin*, 409 S.W. 3d at 344 (explaining that manifest injustice occurs when a "defect in the proceeding [exists that is] shocking or jurisprudentially intolerable[]").

The trial court was correct in denying Lincoln's motion to suppress. During the suppression hearing, Officer Sawyer Bruce testified that he advised Lincoln of his Miranda rights, that Lincoln acknowledged that he understood these rights, that Lincoln signed a waiver, and that Lincoln never invoked the right to counsel. Lincoln does not dispute these facts. As a result, Lincoln's statement, given after he was read his Miranda rights but before invoking the right to counsel, is admissible.[42]

Moreover, there was no violation of RCr 2.14(2)[43] because "[s]imply making a telephone call to the police station is not enough to effectuate RCr 2.14(2)."[44] "The attorney must be denied *access* to the defendant for RCr 2.14(2) to be violated."[45] "Consistent with this Court's interpretive methodologies, this applies the common usage of 'visit' found in RCr 2.14(2)."[46] Lincoln acknowledges our holding in *Terrell* but contends that "[w]hile in-person attorney visits are a crucial part of representation, the past year of pandemic restrictions makes the case for flexibility in defining 'visits' in order to effectuate representation." Still, we see no reason to disturb our previous

---

[42] *See Ragland v. Commonwealth*, 191 S.W.3d 569, 586 (Ky. 2006) ("A suspect may waive his Miranda rights either expressly or implicitly. . . . When a suspect has been advised of his rights, acknowledges an understanding of those rights, and voluntarily responds to police questioning, he may be deemed to have waived those rights.").

[43] "Any attorney at law entitled to practice in the courts of this Commonwealth shall be permitted, at the request of the person in custody or of some one acting in that person's behalf, to visit the person in custody." RCr 2.14(2).

[44] *Commonwealth v. Terrell*, 464 S.W.3d 495, 502 n.22 (Ky. 2015).

[45] *Id.*

[46] *Id.*

26

interpretation of the term "visit" as it is used in RCr 2.14(2). Thus, since Lincoln's attorney was not denied access to Lincoln, no violation of RCr 2.14(2) occurred.

## I. The trial court did not abuse its discretion by admitting Commonwealth Exhibit No. 33.

Lincoln contends that admission of Commonwealth Exhibit No. 33 was unnecessarily or unduly prejudicial. In the photograph submitted as Commonwealth's Exhibit No. 33, Tory's head and face are fully visible, his eyes are open and staring, and his mouth is open, with blood trickling out.

Generally, "the Commonwealth may 'prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see.'"[47] And "general gruesomeness by itself, while prejudicial, is an insufficient ground to keep out relevant evidence; rather, the gruesomeness must be such that it creates substantial undue prejudice or other harmful consequences that outweigh the probativeness of the evidence."[48]

But, "the Commonwealth's prerogative in dictating the specific evidence used to prove its case is not without limit."[49] "Like all evidence, [photographs] are subject to the balancing test of KRE 403[.]"[50] "Although relevant, evidence

---

[47] *Hall v. Commonwealth*, 468 S.W.3d 814, 825 (Ky. 2015) (quoting *Pollini v. Commonwealth*, 172 S.W.3d 418, 424 (Ky. 2005)).

[48] *Id.* at 824.

[49] *Id.* at 825.

[50] *Id.* at 823.

may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[51]

The trial court must engage in three basic inquiries when engaging in KRE 403 balancing.[52]  "First, the trial court must assess the probative worth of the proffered evidence; second, it must assess the risk of harmful consequences (i.e., undue prejudice) of the evidence if admitted; and last, it must evaluate whether the probative value is substantially outweighed by the harmful consequences."[53]

We cannot say that the trial court abused its discretion[54] by allowing admission of the Commonwealth's Exhibit No. 33.  Of course, "[w]hen there is already overwhelming evidence tending to prove a particular fact any additional evidence introduced to prove the same fact necessarily has lower probative worth regardless of how much persuasive force it might otherwise have by itself."[55]  But this evidence was not so duplicative that it was only introduced to inflame the jury.  Instead, as the Commonwealth argued, the photograph of Tory's body showed the holes caused by the gunshot wounds inflicted on Tory's

---

[51] KRE 403.

[52] *Hall*, 468 S.W.3d at 823.

[53] *Id.* (citing *Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012)).

[54] "[T]he balancing required by Rule 403 is 'a task properly reserved for the sound discretion of the trial judge' and is thus reviewed only for abuse of discretion." *Id.* at 827 (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

[55] *Id.* at 824.

body. Lincoln argues that the photograph was duplicative of other evidence. For instance, the jury had seen bodycam footage from a responding police officer where Tory's body is visible on the body cam. The jury also heard the testimony of the medical examiner, Dr. Greenwell, who explained the injuries to Tory's body. And the jury saw some autopsy photographs of Tory's wounds. Even so, Exhibit No. 33, while gruesome, was probative to allow the jury a full view of the extent of all of Tory's gunshot wounds and the position of his body after the shooting at the crime scene.

Ultimately, "photographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect."[56] Here, the photograph of Tory's body, introduced as Commonwealth's Exhibit No. 33, was not so inflammatory that its probative value was substantially outweighed by its prejudicial effect. As such, the trial court did not abuse its discretion by admitting Commonwealth's Exhibit No. 33 into evidence.

### J. The Commonwealth's preemptory strike of potential Juror No. 422 did not violate *Batson*.

Lincoln's last substantive assertion of error is that the Commonwealth's preemptory strike of potential Juror No. 422, an African-American man, constituted racial discrimination in the use of preemptory strikes in violation of *Batson v. Kentucky*.[57] "A trial court's ruling on a *Batson* challenge will not be

---

[56] *Adkins v. Commonwealth*, 96 S.W.3d 779, 794 (Ky. 2003).

[57] *See* 476 U.S. 79 (1986).

disturbed unless clearly erroneous."[58]  Under the clearly erroneous standard,

we are "obligated to give a great deal of deference to the trial court's findings

and should not interfere with those findings unless the record is devoid of

substantial evidence to support them."[59]

Under *Batson,* claims of racial discrimination in the use of preemptory

strikes are analyzed under a three-part test.  First, the defendant must make a

prima facie showing of racial discrimination.[60]  Second, if the defendant makes

a prima facie showing of racial discrimination, the burden shifts to the

prosecutor to provide race-neutral reasons for the preemptory strikes.[61]  Third,

the burden shifts back to the defendant to show "purposeful discrimination."[62]

At the final stage, a trial judge "must evaluate those reasons as he or she

would weigh any disputed fact. In order to permit the questioned challenge, the

trial judge must conclude that the proffered reasons are, first, neutral and

reasonable, and second, not a pretext."[63]

In response to defense counsel's *Batson* challenge, the Commonwealth

advanced several race-neutral reasons to explain the preemptory strike of

potential Juror No. 422.  First, the Commonwealth stated that on his juror

---

[58] *Washington v. Commonwealth,* 34 S.W.3d 376, 380 (Ky. 2000).

[59] *D.G.R. v. Commonwealth, Cabinet for Health & Fam. Servs.,* 364 S.W.3d 106, 113 (Ky. 2012).

[60] *Thomas v. Commonwealth,* 153 S.W.3d 772, 777 (Ky. 2004) (citing *Batson,* 476 U.S. at 93-98).

[61] *Id.*

[62] *Hernandez v. New York,* 500 U.S. 352, 359 (1991).

[63] *Washington,* 34 S.W.3d at 379 (quoting *Wright v. State,* 586 So. 2d 1024, 1028 (Fla. 1991)).

qualification form, potential Juror No. 422 stated that he or his family members had cases pending in Hardin County, but the prosecutor acknowledged that he could not locate additional information about those cases. Second, the Commonwealth claimed that it struck two jurors, potential Juror No. 426, who was white, and potential Juror No. 422, who was African-American, who similarly answered a question asked by defense counsel during voir dire regarding a self-protection issue. Third, the Commonwealth asserted that potential Juror No. 422 "seemed to know a lot about individuals who had been wrongly convicted in St. Louis." Fourth, the Commonwealth stated that potential Juror No. 422 was working four jobs and had ten children, raising a question about whether he could serve throughout trial. As such, the Commonwealth met its burden of stating race-neutral reasons for the strike of potential Juror No. 422.[64]

At the final stage of the *Batson* analysis, the burden shifted back to the defense to demonstrate that the race-neutral reasons stated by the Commonwealth were pretext for racial discrimination. First, defense counsel argued that more than two potential jurors answered in the affirmative to the Commonwealth's self-defense question. The defense noted that while it was true that the Commonwealth also struck potential Juror No. 426, a white man,

---

[64] *See id.* at 360 ("[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."); *see also Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) ("The second step of this [*Batson*] process does not demand an explanation that is persuasive, or even plausible.").

for answering the self-defense question in the affirmative, potential Juror No. 426 also answered affirmatively to a question regarding marijuana. Third, the defense stated that potential Juror No. 422 was open with the trial court about his 10 children and was responsive to all questions, which indicated that potential Juror No. 422 could serve at trial.

Ultimately, the trial court's decision to overrule Lincoln's *Batson* challenge was not clearly erroneous. The Commonwealth advanced four race-neutral reasons for striking potential Juror No. 422. The trial court noted that potential Juror No. 422 indicated that he or his family had cases pending in Hardin County and that the Commonwealth struck potential Juror No. 422 on that basis. The defense failed to respond to or demonstrate that this race-neutral reason for striking potential Juror No. 422 was pretext for racial discrimination in the use of preemptory strikes. The trial court also noted that potential Juror No. 422 was struck because of his response regarding how he would view a potential self-defense issue. The defense argued that reason was pretext because, while the Commonwealth did strike a white potential juror for answering the same question in the affirmative, the white potential juror also affirmatively answered a question about marijuana. But, without more, the defense's response fails to demonstrate purposeful discrimination.

The trial court was in the best position to determine whether the Commonwealth's stated reason was neutral, reasonable, and not pretextual. And there was substantial evidence to support the trial court's finding that potential Juror No. 422 was struck because of his affirmative answer to a

32

question regarding how he would view a self-defense issue. As a result, Lincoln failed to demonstrate that the Commonwealth struck potential Juror No. 422 based on his race.

In sum, in response to the defense's *Batson* challenge, the Commonwealth stated race-neutral reasons for striking potential Juror No. 422. The trial court's conclusion that two of those race-neutral reasons were not pretext for racial discrimination is supported by substantial evidence. As a result, the trial court's ruling on the *Batson* challenge to the strike of potential Juror No. 422 was not clearly erroneous.

**K. There was no cumulative error.**

Lastly, Lincoln claims his convictions should be reversed based on cumulative error, "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair."[65] Cumulative error has been found "where the individual errors were themselves substantial, bordering, at least, on the prejudicial."[66] Here, there are no individual errors that are sufficiently substantial or prejudicial such that their cumulative effect would render the trial fundamentally unfair. So Lincoln has not demonstrated cumulative error.

### III. CONCLUSION

Finding no reversible error on this record, we affirm the judgment of the Hardin Circuit Court.

---

[65] *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

[66] *Id.*

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Molly Mattingly
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Perry T. Ryan
Assistant Attorney General
Office of the Solicitor General